The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right. Be seated, please. All right. We'll hear the next case of Moore v. State of Maryland. Mr. DiMasselli. Yes, Your Honor. May it please the Court. Andrew DiMasselli, Maryland Office of the Attorney General, on behalf of the State Appellants. The State Appellants in this case are asking the Court to reverse the District Court's grant of federal habeas relief on three grounds. First, without input from the petitioner, the District Court improperly identified a Brady claim that Mr. Moore chose not to present to the Court. It counseled Mr. Moore to amend his petition to raise the claim, and then it granted relief on the claim. That was a reversible error according to this Court's decision and false. The second issue we're presenting to the Court is that Mr. Moore's Brady claim was procedurally defaulted, and the District Court erred in concluding otherwise and addressing the claim on the merits. And finally, with respect to the merits of Mr. Moore's Brady claim, the District Court failed to properly defer to the State Court's reasonable decision as the AEDPA standard requires, and it also misapplied the Brady favorability and materiality bonds. The whole factual issue underlying all of these grounds that you've alleged, and we're happy to have you discuss those, but it seems to rest on the notion that the two chain of custody reports have some kind of tension between them. And I'll ask counsel for the other side of this question, but I have compared the two reports, and they seem to be consistent to the minute. That is our position. It's right on the face of the report. You can trace it out of the evidence unit to the lab unit, from the lab unit into the lab vault, out of the lab vault to the expert who did the thing, back into the lab vault an hour later, and then back to the equity unit. And every one of those is documented to the minute. And if there's no inconsistency, the whole thing goes away. I mean, there's nothing. The argument was that the inconsistency created an ability to question whether the lab work was ever done. But if it's consistent, it seems to me you can't draw that inference and use that impeachment evidence. I'll hear you, and I'm going to hear your lawyer. He disagrees with me violently, but we'll see. Well, I couldn't agree with you more, Your Honor. He's been before us many times. I absolutely agree with your assessment. There is no inconsistency between the documents. They are entirely consistent. I can't even see what the argument is for the inconsistency. Well, I'll let my friend on the other side explain his position. Well, let me ask you this. How can we consider them together when only one of them was produced through discovery? I understand what Judge Niemeyer is saying, but that would be ‑‑ I think the argument is one was not produced and the other one was produced. And so how can we consider them together if they were not, if one of them was not produced? Well, in terms of the Brady analysis, of course, you have to look at suppression, favorability, and materiality. But in the first report, the name of the chemist wasn't in the chain of custody, and the chemist was the key witness. So isn't that material? Well, the chemist's name was not in the report, but it didn't necessarily ‑‑ that doesn't mean that the documents are inconsistent. No, the documents aren't inconsistent, but the defendant could have used the report with the chemist's name for impeachment and for evidence at trial, but didn't have it in time. The defense could have used it for impeachment because ultimately the document was introduced in time. And was deprived of using it for impeachment because the defense didn't receive it in time. Well, it is the State Post-Conviction Court's decision that it was introduced in time for the defense to use it at trial, and that decision was not objectively unreasonable under the AEDPA standard. But with respect to the favorability and materiality prongs, which were not directly addressed by the state court in its final decision, it's our position that the documents were not favorable to Mr. Moore because as Judge Niemeyer pointed out, they're not inconsistent. They could have, in theory, attempted to impeach the chemist, but it would have led to nothing because the documents carefully lay out the chain of custody from beginning to end. They are not inconsistent. They were never intended to, I should say, the ECU chain of custody document is not intended to reflect transactions at the laboratory. That's what the laboratory form does. They are perfectly consistent, and I think that the state would have surely pointed that out for the jury. And in doing so, in raising this whole issue, as I think the Post-Conviction Court pointed out, the defense runs the risk of merely highlighting the illicit nature of the drugs and compelling the state to demonstrate how it was, in fact, carefully documented. But Brady requires that the defense make that decision itself and receive the information to allow it to make the decision. But if the defense didn't have the information, it couldn't make the decision in time. Well, again, I mean I think if you're referring to the suppression prong, it was the state court's decision that it was not suppressed. It was introduced in the middle of the trial, granted. But the defense at that point, the chemist had not testified. The defense had time to look at the document. There was, I believe, an hour-long recess in the middle of the trial. There was ample time for the defense to look at the document. Defense counsel testified that he had never in his career seen such a document. But the interesting thing about the state court orders is the state court on the issue of ineffective assistance of counsel said that counsel was not ineffective because counsel didn't have enough time to compare, to look at the document because the document wasn't produced. I think that the state court's decision was a little bit more nuanced than that. In a nutshell, the court concluded that the evidence wasn't suppressed because the defense did have time to use it, but that trial counsel wasn't ineffective because he failed to do so. It said it wasn't reasonable for counsel to be able to look at the document ineffectively, and so therefore counsel was not ineffective. It wasn't reasonable to think that counsel was going to be able to review the document during the trial, but then as to the Brady claim, the state court says, yeah, well, counsel could have taken and looked at it because it was presented during trial. So those two things to me kind of conflict. The second part is the critical piece, that counsel could have, but the fact that he didn't and focused his attention on pursuing the trial defense that he had chosen, which was trying to undermine the credibility of the officers, wasn't ineffective assistance of counsel, that ultimately trial counsel provided Mr. Moore reasonable representation and that he was not deprived of the Sixth Amendment right to counsel. Counsel could have used the document, but the fact that he failed to do so doesn't amount to a Sixth Amendment violation. Of course, this is the merits of the issue, and I would submit to the court that the district court below never should have reached the merits of the issue, for two very significant reasons. The first is that the record is clear that Mr. Moore never raised the Brady claim in his initial habeas pleadings. On March 13, 2023— But he was acting pro se, was he not? He was. And we're to construe pro se litigants' pleadings liberally. I think that you are supposed to construe them liberally, but to a certain extent you can't inject a claim that, as the district court itself found, Mr. Moore chose not to present. He also chose not to appeal it in the state court. That is our second issue, and I'm happy to address that now if you'd like. It's pretty clear he identified in his papers that he had raised it below, but then he chose pretty clearly not to present it on appeal. That is our interpretation of the documents, absolutely. He presented his application for leave to appeal to the Appellate Court of Maryland on a preprinted form petition, which had two clearly defined parts, a background statement of facts section where he was to list the claims that he raised below, and an argument section where, as the Maryland rules require, he is required to specify his claims. He's required to identify the arguments. But doesn't he identify the Brady violation claim in the allegations of errors page that he attaches to— I mean, once again, we're dealing with someone that's pro se, but he does in the allegations of error attach, I think it's at JA 135 or 136, where he says the question, is there a Brady violation? He did present the question, I think, in response to the procedural history section of that form. The court has a section on the first page that asks the petitioner or the applicant in this case to identify the claims that were raised below. Isn't the ineffective assistance of counsel intertwined with the Brady claim? Isn't that what Unger tells us, that we need to not find that there's a procedural default? Unger refers to claims that are inextricably intertwined in the sense that a court could not address one without the other. And we submit to the court that that is not the case for a Brady and a Strickland claim, that they are absolutely separate, they are distinct, and despite the factual overlaps in this case, the district court did not need the Brady claim in order to adjudicate the Strickland claim. In fact, if the court looks at the district court's interim opinion, March 13, 2023, the court concludes that the state post-conviction court was not objectively unreasonable in applying the Strickland performance prong. And therefore, the claim was decided at that point, which brings me back to our primary argument. The issue with the Strickland claim had already been decided by the time the court decided to identify the Brady claim, appoint counsel, request briefing, and essentially counsel Mr. Moore to raise the claim. And that is a direct violation, we submit, of this court's recent decision in Foulkes. That's exactly what happened. But Foulkes was a little bit different because in Foulkes, the district court there set out seven different claims and asked the counsel to address those claims. Whereas here, he says, file the appropriate motion. He doesn't tell them what motion to file. He says, file the appropriate motion. I think he says, I'm going to appoint counsel and give you an opportunity to reframe your complaint and appoint. And you can also file the appropriate motion. But he doesn't tell them what motion you need to file. He just says appropriate. In order to bring the Brady claim before the court. I don't think there's any question about what the district court was asking Mr. Moore and his counsel to do. The court was talking about reframing the petition. It asked the parties to address the Brady issue, to brief the Brady issue, and to the extent that the Brady claim wasn't before the court, which it wasn't. I think the court recognized that. He told Mr. Moore and his attorney to file an appropriate motion so that the court can consider the Brady claim. But Foulkes talks about expanding. And I think because in that case, there were additional seven claims. It just seems a little different than what happened here in this case versus Foulkes, where there's seven additional claims that are. And so in that case, this court talks about expanding the claims. I think, honestly, I submit to the court that this case is worse than Foulkes. Because in that case, the expansion of the petitioner's petition was really quite small, in my opinion. And here, the court didn't just sort of expand an existing claim. It added, in essence, a claim. It raised an entirely distinct claim. Brady is not Strickland. It is entirely distinct. Well, they're entirely distinct legal claims, but they're based on the exact same facts. And that's the Younger issue, and that's the issue here, that there's no introduction of new facts. There's a different argument based on the same facts. It is the same underlying facts, but the Brady materiality prong and the Strickland prejudice prong are certainly similar. But there's no overlap between the Strickland performance prong and the Brady suppression prong. And ultimately, they're not inextricably intertwined. That's what Younger is talking about. If, in theory, the defense – if Mr. Moore, for example, had conceded that the claim was procedurally defaulted, the district court could still – It doesn't say – Younger doesn't say inexplicably intertwined. It says sufficiently interrelated. That's quite lower standard than inexplicably – I – well, I recall it saying inextricably intertwined. It is settled principle of Maryland procedure that for purposes of preservation in various contexts where the issue raised by the litigant is sufficiently interrelated with another issue not raised, the court will treat them as if both issues are raised by the litigant. That's the language of Younger. I'll have to review it again, but I – my reading of that case is that the court was indicating that in a situation where the claims cannot be reviewed separately, there is not a preservation problem. But when they can be reviewed separately, as in this case, the petitioner has to raise it. And I think that that's what the habeas rule 2C says, that the petitioner has to specify the claims he's raising. And he didn't in this case, and that's what the district court found. The district court found that he did not specify a Brady claim, that he chose not to present that claim. And therefore, the district court, I think, was not permitted under false to expand a petition or to essentially inject a dispute into the case that didn't previously exist among the parties. In this case, Mr. Moore chose not to present that claim, and the court concluded that his Strickland claim was meritless under AEDPA review. And therefore, the case should have been over at that point. There was nothing else for the court to explore. The court had already concluded that his remaining claims were meritless or unreviewable, and the case should have been over. And again, to sort of return to the point that I wanted to make earlier, if Mr. Moore had in essence conceded that the claim was procedurally defaulted, which he did, but in theory if he did, the court wouldn't have been precluded from addressing the Strickland claim without addressing the Brady claim. Certainly, they have factual overlap, but the court didn't need the Brady claim in order to address his Strickland claim, especially considering that it had a complete record from the state courts that it could review, and they are distinct claims. In addition to the arguments I've made on the district court's expansion in our view of the record of the claims, we've already addressed the procedural default on the ground that Mr. Moore failed to present it to the appellate court of Maryland in his application for leave to appeal. But in addition to that, Mr. Moore waived the issue in the state circuit court on remand when the case came back down the first time after the parties agreed that the ECU chain of custody was in fact admitted into evidence at trial. Trial counsel told the state post-conviction court that I think that should cause the denial of the Brady issue. And the post-conviction court agreed, and ultimately the claim was waived because he invited the outcome that the post-conviction court ultimately provided, and the Maryland courts would not review an invited error on appeal. And again, I think opposing counsel is going to probably make the argument that you all didn't raise that it was waived because you didn't raise it before the district court. The cases that my friend on the other side cites are from cases in which the state did not raise any procedural default argument at all. We raised the procedural default argument, and we made this argument, albeit in a footnote. It was in our papers below, and therefore the district court should not have ignored the issue and granted relief. Thank you, Your Honor. Mr. Patel? Good morning, Your Honors. I'd first like to start with the procedural arguments, then I'll get to the merits, then hopefully battle it out with Judge Niemeyer. But first, I just wanted to start with the folks issue. So the district court did not cross the line here between jurors and advocates because here the district court did not sua sponte add the Brady claim and require a briefing on it. Rather, the court merely appointed counsel to explore the Brady issue, i.e. to perhaps reframe the ineffective assistance of counsel issue into a Brady claim upon following the appropriate processes. So all the court was saying here and clearly said this is that if counsel, upon exploration, thought that there was a meritorious issue to add, then counsel had to file a motion to amend and convince the court that it was appropriate to amend the motion, the pro se petition. So it was counsel then who moved to amend the petition, not the court itself. But the court did sua sponte amend the petition, and that's why this case is very different from Bogues v. Nelson. Don't you think the district court invited the lawyer to basically make the Brady argument? It seemed to me that the lawyer would have to be pretty dense if he didn't raise that. Well, Your Honor, we have – Based on what the district court said. We have to take the district court at its word, and what it said is to the extent that a reframing of the petition is necessary for the Brady issue to be properly before the court, petitioner's brief should be accompanied by an appropriate motion. So, yes, the court said explore this issue. I think it may have merit. But that's very different from adding the claim itself and saying you have to brief the issue. That's already after it already recognized that the only issue raised was the ineffective assistance, and that was without merit, and that the Brady claim had not been raised. It acknowledged that in its opinion. And then it basically had that clause you just said invited counsel to brief. Your Honor, so we have to take the district court at its word. I think the state wants to assume that the district court acted in bad faith. It specifically said – Well, not bad faith. It basically said that the habeas petition as filed is unsustainable. It denied it. Your Honor, the court affirmatively said ground five, the IAC claim, quote, requires further review. And then the court appointed counsel specifically quoting for the limited purpose of assisting more than more in further briefing and perhaps reframing ground five. And then, again, it said to the extent that a reframing is necessary, counsel must amend the motion. So the court clearly said, yes, it was leading against counsel on the ineffective assistance of counsel claim, but it did not decide the issue. Your Honor, it's often the case in district court we'll be at a hearing and the judge says, look, I'm leaning against doing this. But there's not a decision until the decision comes out, Your Honor, until it is issued. Because if that were true, then if we appealed before the final decision, the state would be saying, oh, it's not appealable because the state didn't actually – or the district court didn't actually issue the decision. But in any event, Your Honor, even if the court did decide the IAC issue, still the court didn't sua sponte add the Brady issue. The court said to the extent, counsel, that you think that the Brady issue is meritorious to add, then you have to follow the appropriate processes. And that's very different from Folks v. Nelson where unlike that here, the court did not counsel to explore an issue not raised in the petition and didn't say perhaps reframe the issue and didn't suggest that perhaps you should follow a motion to amend to the extent that counsel believes that an issue is meritorious. Instead, the court sua sponte required mandated briefing on seven different issues that were not included in the petition. So the court sua sponte there added the issue. It effectively – it sua sponte effectively amended the petition. Your Honor, moving on to procedural default, to begin, Your Honor, the state argues that Mr. Moore procedurally defaulted his Brady claim in the state postconviction court when counsel suggested at the last postconviction hearing that the Brady issue doesn't have merit. But that cannot work here. It is well settled under Supreme Court law, Harris v. Reed, that when the state postconviction court decides an issue on the merits, then only if the court clearly and expressly, quote, states that its judgment rests on a state procedural bar, only then can there be procedural default. And here the state postconviction court didn't say a word about any type of procedural bar, invited, error, or otherwise. So, Your Honor, in our briefs, we note the reason why the state – Well, how would it say it if it was not presented to the court? It was presented to the court, Your Honor, and the court decided the issue. So this statement, the court must clearly and expressly state that its judgment rests on a state procedural bar, that didn't happen here. The court never said because the error was invited, I'm not going to decide it. The court did decide the issue and didn't invoke the procedural bar. And this is a very bright-lined rule in Harris v. Reed. There, in fact, the court even identified – the district court identified that the procedural bar that counsel could have brought an ineffective assistance of counsel claim on appeal and didn't. But the Supreme Court still said that there was no procedural default because the court didn't make clear that it rested its judgment on that procedural bar. So, Your Honor, in addition to the state procedurally defaulting the claim, this plain statement rule, that is what it's called, makes absolutely clear there's no procedural default in state post-conviction court. Additionally, Your Honor, Mr. Moore also preserved the issue in his application for leave to appeal. And now we have to consider that pro se proceedings must be construed liberally. In Maryland, because prisoners are not trained in the law, that imprecise language, vague language should not be an excuse not to give full consideration to the complaint. And as Judge Berner pointed out, it's clear that when the issue raised by a litigant, even one who is not pro se, is sufficiently interrelated with another issue not raised, then the court will treat them both as if they were raised by the litigant. That is black-letter law. So applying these principles here, Mr. Moore sufficiently raised his Brady claim. So in the application for leave to appeal, as Judge Benjamin pointed out on page J35, it has a heading that says allegations of error, and then under that, Mr. Moore specifically states the Brady claim. Did the state commit a Brady violation? Before even getting into anything else, that in and of itself preserves the Brady claim. Now, the state says that Mr. Moore was just listing the errors that he had asserted in the post-conviction court below here, but that can't be right. The reason that can't be right is because the errors raised in the post-conviction court below were different in substance and number. If you go to page J365, there were six issues that were raised in the post-conviction court below, and also number two in the application for leave to appeal, that issue wasn't raised in the post-conviction court below. So, Your Honors, page J35 is asserting the errors on appeal, and specifically, Mr. Moore says, did the state commit a Brady violation? But the heading says that he's answering allegations of error raised on post-conviction, and he lists them there. Then the next page, it asks for reasons that the circuit court erred from denying applications, and he doesn't address the Brady claim. So, Your Honor, two things. First of all, he writes in allegations of error. He's asserting the allegations of error on appeal for the reasons I just gave the court, because the errors on post-conviction court below were different in substance and number. Yes, on the first ... It might be in substance and number, but ... And in substance. So, on the first page, Judge DeBuyer, it says ... I don't think that's an excuse for ... in other words, when he says, below, I raised Brady, and then the next page, he's told to say what his reasons for appeal are, and he doesn't raise Brady. But, Your Honor, he's not doing that, because the first page, yes, it says statement of facts, and it says list the allegations of error raised on post-conviction. He leaves that blank. He doesn't fill that out. He doesn't leave it blank. He answers it. He does leave it blank, Your Honor. Look on page 134. It's blank. Well, it's not blank. It continues at the top of the next page. No, but that's the point. He writes in allegations of error, and then because these are not the same as the claims that he raised ... Well, it asks – the question says allegations of error raised in post-conviction. Right, but he doesn't fill that. And so he then writes allegations of error. No, but that he's asserting on appeal. The reason we know that is because these are not the same as the ones he raised on post-conviction. So he's chosen the ones that he wants to assert on appeal. In any event, Your Honor, also, the next page, the reasons for the error, he raises issues that are interrelated with the Brady claim. So even based on that alone, Your Honor, he's preserved the Brady issue. Which one are you referring to? So he raises the ineffective assistance of counsel. I know. Which number? That's number 3, Your Honor. Yeah, so there he raises ineffective assistance of counsel based on the same facts, based on the ECU report. And, Your Honor, those issues, as Judge Bernal was pointing out, are really two sides of the same coin. Because if the state disclosed the form in sufficient time for counsel to make effective use of it, and counsel didn't do so, then there's an ineffective assistance of counsel problem, but there's not a Brady problem. But on the other hand, if the state did not disclose the form in sufficient time for counsel to make effective use of it, then you don't have an ineffective assistance of counsel problem, but you have a Brady problem. So they're completely interrelated and actually even intertwined because they are two sides of the same coin. Additionally, Your Honor, if you look to the last issue on number 4, there Mr. Moore asserts that the state post-conviction court erred by not giving him copies of the ECU report that were in the state court file and in the state prosecutor's file. And he says that hampered his ability to investigate the Brady claim. So again, that of course is related to the Brady claim that he's raising here. And so for those reasons, he did not procedurally default in the application for leave to appeal either. And Your Honor, that brings me to the merits of the case. So this court – or I'm sorry, the district court correctly found that the state post-conviction court unreasonably applied Brady to conclude that the ECU chain of custody form was not suppressed. So starting first with that with suppression, Your Honor, the state post-conviction court's decision was unreasonable because the state disclosed the ECU form too late in time for counsel to reasonably make effective use of it. Indeed, as the state post-conviction court itself acknowledged, it was too difficult for trial counsel to exhibit the mind and capacity to spot the document's impeachment value mid-trial, mid-testimony, when counsel's focus had been on a completely different issue that had nothing to do with undermining the credibility of the chemist. Indeed, Your Honors, it would have required too much of counsel to on the fly examine multiple pages with multiple – I must say in preparation for this hearing, it took me about five minutes. Well, if I could continue, Your Honor, there's – yes. So it would have not only required examining them in small typewritten words in the ECU form, and then the counsel would have had to compare it to the laboratory form, which also had multiple entries, and then counsel would have had to ascertain the discrepancy between the two, all when counsel's mindset at the time was on a completely different theory that had nothing to do with the ECU form. And then on top of that, Your Honor – What if we were to conclude there's no discrepancy? If there's no discrepancy, Your Honor? If there was no discrepancy and there was no basis to question that the chemist ever tested drugs, yes, then we would lose. But I'm going to get to materiality too, Your Honor, and there is a very, very reasonable reason to question whether or not the chemist actually retrieved the drugs because there is good cause to believe there's discrepancy, Your Honor, between the documents. And I'll get to that in a minute, but I first wanted to just finish up with the suppression. So, Your Honor, even if counsel was reasonably able to identify the discrepancy, it was still too late because counsel would have had to then investigate the discrepancy and look into the previous conduct of the chemist to determine whether there was any previous dishonesty in the background, and counsel was deprived of the opportunity to do that because of the late disclosure. And on top of that, then counsel would have had to figure out whether to add an alternative theory or change the theory of the defense altogether mid-trial and then figure out whether to call the chemist to exploit the inconsistency or whether to just impeach the chemist through Detective Surratt's testimony. So, Your Honor, even if despite all of this, let's say that Judge Niemeyer was right and counsel was reasonably able to assess the impeachment value of the ECU form, there's still a problem here because it was mid-trial that counsel would have had to shift gears and all of a sudden argue a different theory of the defense. That would have undermined the credibility of the defense mid-trial because at that point, it would have looked like counsel was just throwing anything and everything at the wall hoping that something sticks. So, Your Honor, without knowledge of the document pre-trial, it is simply not reasonable to conclude that the counsel could have made effective use of the document. Also, Your Honor, one other point I wanted to make here is that the state says that there was an hour lunch break in which counsel could have learned and figured out what to do with the form, but there's three reasons why that argument doesn't work either. Because again, by the time that the form was revealed, counsel's theory of the defense had well set in that Mr. Moore never possessed the alleged drug. So, with that mindset, impeachment of the chemist was reasonably not on counsel's radar. So, considering that, it's unreasonable then to expect counsel on the fly to have spotted the problem with the form, particularly when it was unrelated to the defense of the theory at the time. And second, Your Honor, even if it was reasonably able to spot the impeachment value of the ECU form, there was still time needed to investigate the discrepancy as to what were the procedures in the evidence control unit, what was the practice there, what was required to be included on the form or not, and to investigate any previous misconduct in the chemist's background. All of that couldn't have been done in an hour. And then, as I said earlier, counsel would have been forced to change his theory in the middle of trial. So, there was just too much going on, Your Honor. Why is there a reasonable probability that if it had – if the second report had been disclosed earlier, the outcome would have been different? Okay. So, yes, Your Honor. I think that there's very much a probability that the outcome would have been different. Now, before you answer your question, Judge Burner, I just wanted to say that the materiality standard is not demanding. Mr. Moore doesn't have to show by preponderance of the evidence that there would have been acquittal or more likely than not that there would have been acquittal. All we have to show is that it reasonably – the ECU form reasonably cast the case in a different light so as to undermine confidence in the outcome of the verdict. And it did so, Your Honor, because two reasons. So, there's two important pieces of information here that went unrefuted. The State did not put out any evidence to refute that. First was the notation on the ECU form itself, which said that it documented all transactions that occur on the item. It didn't say that that document only documents transactions that occur in the evidence control unit itself. And, Your Honor, it's not only that. We also had Detective Surratt's testimony after that where Detective Surratt, quote, said the form documents every time somebody takes custody of the narcotic from when it is received to when it is submitted. Now, the detective did not qualify that by saying that the ECU form only documents movements within the evidence control unit itself. Let me just take you – I mean, your time's running out, but here I'm looking at page 334, 335, and 336. Yes. 334 is the chain of custody in the evidence control unit. It says on November 4th the evidence was checked out and given to the lab. You go to the lab and it says about 10 minutes later, on November 4th, it was received. Then it says while it's in the lab, then it goes into the vault, received into the vault, and then it's checked out in the lab – let's see, where's it checked out? On the 9th to Barry Berger. He's the guy that tested it. Then it goes back in about an hour later, and then it checks out on December 10th back to the evidence room. Then you go back to the other one. It says December 10th, received in the evidence room. It's just an exact fit. In other words, the evidence control room has checked out to the lab on November 4th and received from the lab December 10th. So there's a gap there. It goes to the lab December 4th and the 10th. So you go to the lab and it shows received on the 4th and sent back to the unit on the 10th. While it's in the lab, they have entries for when it was taken out and tested and put back in the vault. It is just minute for minute, and it has the person who did it, the badge number, the signature of the person. I just don't see a discrepancy. So, Your Honor, there is a discrepancy, at least as a reasonable basis to question whether or not the evidence was retrieved by the chemist and tested. Because we have to accept what the chain of custody ECU form says. It says the following is a chronological list of all transactions performed on this item. And then when you – All right, so let's take the November 4th. It goes out, right? But this is on the form. ECU – I understand. I understand. We're on the ECU form, and this is what he has at trial. Sure. And it shows checked out from the evidence room on November 4th, right? Yes. All right. The next entry is December 10th, and it says received from the lab on December 10th. Right. But what's missing there? Missing there is there's nothing – It's at the lab. But it's not – this says that all – This is the evidence. It says the evidence custody unit checks it out to the lab. And then they receive it back from the lab on the 10th. But, Your Honor, this form says all transactions, whether in the ECU unit or otherwise, that's what it – that's how we have to interpret it because it doesn't limit it to movements in the evidence – No, but the point is that when the two documents were later examined, both you and the district court contend there's some tension between the two. There are. All right. All right. I respectfully disagree. I think it's actually as plain as day. I mean, if I were interpreting these two documents, I can give you minutes, and the only discrepancy is about five or ten minutes between each transfer when they go from the lab back to the – Well, Your Honor, if it was so clear that the evidence – Well, I just traced it through. If it was so clear that the ECU form only recorded transactions that occurred within the evidence control unit itself, then – No, it doesn't matter. That's irrelevant because the unit itself says we transferred it out to the lab. Yeah, but the question is what has to – And it does not purport to – it's been in the lab the whole time, and it comes back. So that's all accurate. But the question is what has to be included on the form. And this form is telling us any time there's movement in the laboratory or in the evidence –  That's what it's saying. This is an ECU document. It says the following is a chronological list of all transactions performed on the item. And then we have Detective Surratt who said that. And, Your Honor, if it was so clear that this form only documented transactions that occurred – No, I'm not saying it only documented. I'm saying the problem is later when we're analyzing this under habeas, we have both documents. And the only basis, the only basis for the district court saying impeachment could have occurred is because the two documents were inconsistent. And the two documents are just simply not inconsistent. Your Honor, by the way, I just wanted to correct. This is habeas, but if this court finds that the evidence was – that the state post-conviction court unreasonably found that the ECU form was not suppressed, then we're on de novo. And so materiality is to be considered de novo. We have a district court that decided it was presented with ineffective assistance of counsel, including how to handle that document. The court concluded the counsel was not ineffective. Then the court said, but there may be a Brady violation because of the difficulty between the two documents. And that is where the court was a volunteer and went out. It's not just the district court. The state post-conviction court also found that there was a discrepancy and that it was material. So we have two courts now who have found that there's – Did the state court have both documents? The state court did. In the state post-conviction court, in the last opinion, the court continued to say that it was material. No, my question to you is did the state post-conviction court have both documents, the lab document and the evidence room? They had them both. Yes, they had them both, Your Honor, and there was a discrepancy. Well, that's all the worse. I mean, the question is why are we fighting procedurally over this long process and ordering a new trial over the fact that two documents, which are read together, are just clearly – create the chain of custody. There is no impeachable evidence here. And the question is we're sending it back for a new trial to determine these two documents cause a new trial? That's what you're arguing. Your Honor, I respectfully disagree. The state had every opportunity. There were four post-conviction hearings here to establish – Let's proceed. We're now – we have hindsight right now. We're sitting here as an appellate court, and the issue before us is should this case be retried based on hindsight now? And that's what happens when there's a Brady violation, Your Honor. If there's a Brady – there's not a Brady violation. There's nothing inculpatory or impeachable here. The question, objectively, nothing impeachable. You cannot tell this man – Your Honor, if one document that Detective Surratt said must include all transactions, and then on the ECU form itself it says it must include all transactions, not just limited to one place evidence control unit, and we don't see any entry from the chemist indicating that.  But that's on a different document. It's on the chain of custody. In other words, the chain of custody in this –  Also, Your Honor, I think it's important to point out here too that if you look to the laboratory form, the laboratory form has some overlap with the ECU form. The state keeps saying that they're two separate documents. One documents all the transactions that occurred in the ECU unit, and the other documents the transactions that occurred in the laboratory. But they're not as separate as the state says they are, Your Honor, because even in the laboratory form there's transactions recorded that occurred in the evidence control unit. So why wouldn't the same apply to the evidence control unit then? If you look at the first slide, it says ECU, Officer Ronald J. Surratt. This records the time that he took the evidence to the evidence control unit, yet it appears on the laboratory form. So, Your Honor, it makes sense that the evidence control unit form would also indicate all entries. Well, that's even more indicative of the fact you have to read the two forms because this lab form covers only the time from November 4 in the lab, from November 4 to December 10. It doesn't. It also has 1103, the first entry. Yeah, but that refers to the evidence room. Well, that's my point. And he's sitting there documenting on the fact that the evidence room has it. Now the next line says when the lab received it. I mean, it's just not – I don't know what you're making a fuss out of something that's just not confusing. Your Honor, two courts thought that there was something to make out of this. Judge Bernard is a very smart judge, as you know, Meemeyer. He has your intellect. I agree. He's a very smart judge. He's a very good judge too. Yes, yes, absolutely. And you're a good lawyer. All right. We're way over time here. We understand. Great. Thank you. All right. Mr. DiMasoli. Thank you, Your Honor. I'll be brief. I just want to briefly address Judge Berner's question about the Unger case. I don't have the full opinion before me, Your Honor. I apologize for that. But on page 17 of our reply brief, footnote 9, I cite inextricably intertwined with one another. That's the Unger case, 427 Maryland at 407 and 408. So I think that the Unger court did discuss inextricably intertwined with respect to claims that have to be raised. The second issue I want to point the court to. Let me ask you a question just based on the previous exchange. So when the drugs are transferred to the lab, right, the ECU form is attached to the, I guess, Ziploc bag or whatever contained in the drugs? I don't think the record makes that clear. I'm not sure that it is. So there's one kind of curious aspect to this case, which is the chain of custody from the ECU in this case is dated after the trial happened. So I think that as we pointed out in our, I think, our reply brief, this is an electronically generated document. I don't believe it travels with the evidence. And, in fact, there's no physical signatures on here. So it would make no sense that it would travel with the evidence. And the same thing goes for the laboratory form. Yes, there are sort of cursive signatures, but they're identical. These are electronically generated signatures on an electronically generated form. These forms are separate. They don't follow the evidence around like in the days of old where they would sign off everywhere it goes. So these are not inconsistent. And to sort of respond briefly to my colleague's point, it does say all transactions, but this is the ECU form, the electronic. This is the evidence control unit form. It never says that this form is intended to follow the evidence around and log transactions at a different location. And at both the state post-conviction- It doesn't cover any custody from the officer bringing it in. I mean the officer obtained it out in the field. They found the evidence had been disposed of, and he had it in his vehicle, I'm sure, and brought it in. And so it doesn't cover that. And it doesn't cover what happened after it, after the last entry. Yeah, and I'll also point out to the court, if this was intended to log all transactions, what is the purpose of this laboratory form? Why does it even exist? Well, the answer is, I think, clear because this is the ECU, and this is the laboratory, and they don't necessarily track logging of evidence at their respective location. What about his argument that the lab report does track, is tracking the ECU logging? I think it's logging who initially brought the evidence in for their purposes. I'm guessing that they want to know who was the officer who brought this in in the first place, and where did the drugs go when it got back to the ECU? And then it stops. But the first entry basically says ECU, the guy put it in the ECU, so it's not at the lab. It's coming from the ECU, and this was the officer who initially brought it there. And then this is the laboratory. This is the Barry Berger is on there, and then it goes back to the ECU, and the documents are not consistent. It goes to him just for an hour, I think, to examine it. I think it was just about an hour. Yeah, which is entirely consistent. He checked it out and then checked it in. I don't think that there's anything here. Certainly the defense could have called in the chemist. I know, but regardless of what could have happened, what we're now trying to determine as an objective matter, whether this was Giglio type of evidence, Brady. And my suggestion is that when I look at this, I don't see how we have anything that even had to be disclosed unless it was under some relevant standard. There's nothing here that's exculpatory. I agree. It just basically says in and out, this is where the evidence went. The argument is because the two documents are inconsistent, therefore they were manufactured, therefore the officer was lying when he tested it. But there's nothing here to suggest that. I agree, and I think it's far-fetched to believe that the jury would have looked at these two documents. On this hypothetical that this is all false, and therefore the lab guy didn't test it that one hour when he took it out and put it in, and therefore it's a false made-up test, you don't get that from the document. You may get it somebody else can say it. And so the question is we're going to have a whole new trial on this hindsight look at something that never exculpated anybody. Yeah, I agree. May I make one brief point? Yes. Just in response, I mentioned there's an hour-long lunch break during the trial. The point I really want to make is that the trial counsel had sufficient time to see what this document is, recognize that I've never seen this before, and he could have asked the court for a postponement to conduct whatever investigations he needed to in order to utilize this document. And so in terms of suppression, he had sufficient time. It wasn't like he was – At the trial, did just the ECU go in, or did they both go in? I think it was just the ECU. And when did the lab – The lab was disclosed in pretrial discovery. Oh, in pretrial? Yeah, the laboratory form. They never raised the Brady claim with respect to the lab reform. They had that. So they had that? They had the lab form, yes. So they just got the ECU form during the trial? Right, and then – yeah. And their argument, of course, is that you can't compare the two mid-trial, on the fly. And our brief response is – Well, now the district – the circuit court said the same thing when she reviewed it as to the ineffective assistance of counsel. She said it wasn't reasonable for counsel and it wasn't ineffective for counsel because of the late disclosure of the document. Right, but he could have. And I think the reason he could have is because he could have seen this form. He should have immediately recognized that this is something I've never seen before and said, I need a postponement to look into this, and then called the chemist and impeached him for whatever that was worth, which, as Your Honor and I agree, was absolutely nothing. So for these reasons – Thank you. We'll come down to Greek counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Nicole G. Berner